```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          AT BECKLEY
```

REBECCA MULLIS, individually
and on behalf of a class of
similarly situated persons

    Plaintiff,

v.                                 CIVIL ACTION NO. 5:12-03158

MOUNTAIN STATE UNIVERSITY, INC.,

    Defendant.

MEMORANDUM OPINION AND ORDER

Pending before the court is plaintiff's motion for class certification (Doc. No. 32). For the reasons that follow, the court denies the motion.

I.    **Factual and Procedural Background**[1]

Plaintiff, Rebecca Mullis, is a former student of defendant Mountain State University's ("MSU") online Diagnostic Medical Sonography ("DMS") program. The alleged failure of MSU to provide geographically convenient or otherwise practicable clinical sites at which plaintiff and putative class members could fulfill the DMS program's clinical externship requirements is the crux of this putative class action. The complaint alleges

---

[1] The following factual background is derived from exhibits presented by the parties and the evidence presented at the hearing on the motion for class certification held on December 18, 2013. The court makes these factual findings for the sole purpose of deciding plaintiff's motion for class certification.

1

five counts, consisting of breach of contract, negligence, negligent misrepresentation, unjust enrichment/breach of quasi-contract, and violation of the West Virginia Consumer Credit and Protection Act ("WVCCPA").  See Doc. No. 12 (Amended Complaint) at 12-18.  Plaintiff moved for class certification and appointment of class counsel on June 5, 2013.  Doc. No. 32. Plaintiff seeks to certify the following class:

> All individuals residing outside of West Virginia who enrolled in an online Medical Diagnostic Sonography program at Mountain State University at any time from the program's inception in 2007 to the present, for whom Mountain State provided no clinical externship site within three hours of the student's home or another practicable location in the student's area.[2]

Doc. No. 33 at 7.  This matter has been fully briefed, an evidentiary hearing was held on December 18, 2013, and the parties submitted proposed findings of fact and conclusions of law.

MSU offered bachelors, associate, and certificate levels of studies in DMS.  The bachelor's program comprised 138 credit hours, including five clinical rotations and forty hours of prerequisites.  Students needed sixty-four DMS-specific credit

---

[2] The initial proposed class detailed in plaintiff's amended complaint mentioned nothing about residing outside of West Virginia, but is the same in all other respects.  See Doc. No. 12 at 3.  Any mention of the class or proposed class in this opinion is referring to the proposed class as stated in plaintiff's brief in support of her motion for class certification which includes the outside West Virginia qualifier.

2

hours to obtain an associate degree, including three required clinical rotations and forty hours of prerequisites for a total of 104 hours.  Such prerequisites were not required of students having previously graduated from an AMA-approved health sciences program or students who successfully completed the prerequisites at another institution.  Doc. No. 41-1 (Declaration of Tammy L. Mollohan) at ¶ 2.

MSU offered a traditional or "in-seat" DMS program beginning in 1993.  The student handbook for that program included a travel policy requiring students to travel up to three hours from Beckley, West Virginia (the site of MSU) to attend clinical externships.  Doc. No. 52 (Transcript of hearing on the motion for class certification) at 88-89.  The online program started in 2007, and students from various parts of the country were admitted.  The "three hours from Beckley" limitation applicable to traditional students was generally interpreted to apply to the online students to mean three hours from the student's home.  Id. at 55, 89.  This application of the three hour limitation to the new online DMS students was not initially formalized by a written policy.  Id. at 50, 122.  Beginning in the spring 2010 semester, the three hour restriction for online DMS students was eliminated, and new students were required to sign a written Clinical Travel Agreement.  Id. at 90-91.  This agreement provided that MSU would attempt to place students in clinical

3

facilities within their areas, but that there might be times when available sites were outside the students' areas requiring the students to make arrangements to travel to the sites.  Id. at 91.  This new agreement did not mention the three hour limitation that had informally been utilized for the online DMS students.  Id.  Students admitted to the program prior to the spring 2010 semester were asked to sign the agreement, but they were not required to do so.  Id. at 125.  In late 2011, the travel policy was again amended to state that students would be expected to travel or relocate for the purposes of completing the clinical requirements.  Id. at 93.  This new policy applied to students starting the online DMS program in the spring 2012 semester.

 In late June of 2011, the Higher Learning Commission of the North Central Association of Colleges and Schools ("HLC") placed MSU's university-wide accreditation on "show cause" status.  Doc. No. 41-1 at 3.  Students admitted to MSU thereafter were advised of this show cause status in their acceptance letters.  Id.  On March 30, 2012, the Commission on Accreditation of Allied Health Education Programs ("CAAHEP") placed MSU's online DMS program on probation partly due to delays in placing students in clinical rotations and because MSU had not provided documentation addressing how the delays would be alleviated.  Doc. No. 42-10 at 2.  MSU's university-wide accreditation was eventually withdrawn in July of 2012, and MSU's subsequent appeal of that decision was

4

unsuccessful.  Doc. No. 41-1 at 4.  MSU closed on December 31, 2012.  In an attempt to minimize the impact of the closure on its students, MSU developed a "teach-out" plan to permit students to complete their studies at the University of Charleston.  However, MSU did not continue the online DMS program – the subject matter of this litigation.

**II. Analysis**

Rule 23 provides for a two-step analysis to determine whether to certify a class action.  First, a plaintiff must satisfy all of the requirements of Rule 23(a).  That is, a plaintiff must show that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  See Fed. R. Civ. P. 23(a).  The common short-hand for these requirements is numerosity, commonality, typicality, and adequate representation.  Second, a plaintiff must establish that the proposed class falls within one of the three subsections of Rule 23(b).  See Fed. R. Civ. P. 23(b)(1)-(3).  Here, plaintiff relies on Rule 23(b)(3) which authorizes certification when (1) questions of law or fact common to class members predominate over any questions affecting

5

only individual members; and (2) a class action is superior to other available methods of adjudication.

District courts have broad discretion to determine whether class certification is proper under Rule 23, and the district court will only be reversed upon a showing of abuse of that discretion.  Stott v. Haworth, 916 F.2d 134, 139 (4th Cir. 1990); see also Roman v. ESB, Inc., 550 F.2d 1343, 1349 (4th Cir. 1976) ("[T]he determination of a district court that an action does not meet the requirements of a class action will not be disturbed unless it is clearly erroneous.").  The party seeking certification bears the burden of proving each of the requisite elements of Rule 23.  Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 321 (4th Cir. 2006).  The failure to establish these elements precludes class certification.  As stated by the Supreme Court,

> [A] party must not only "be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact," typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a).  The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b).

Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) (quoting Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551-52 (2011)).  Certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  Gen. Tel. Co. of Sw. v. Falcon, 457 U.S.

6

147, 160 (1982). It is often the case that this "'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." Dukes, 131 S. Ct. at 2551.

### a. Numerosity

In this case, plaintiff's motion for class certification suffers from at least one dispositive defect. Plaintiff has not shown that the proposed class is so numerous that joinder is impracticable. Plaintiff summarily asserts that "[t]here can be little question that the class of students proposed here, which numbers in the hundreds, meets the numerosity requirement." Doc. No. 33 at 10-11. Defendant provides more than a "little question" to this statement. In fact, defendant positively refutes it with evidence – evidence which plaintiff never satisfactorily combatted despite the fact that it is her burden to establish that joinder is impracticable.

In addressing whether the class is so numerous that joinder is impracticable, "[t]here is no mechanical test." Kelley v. Norfolk & W. Ry. Co., 584 F.2d 34, 35 (4th Cir. 1978). Rather than relying solely on numbers, the court is required to analyze the factual circumstances of each case. In re Serzone Products Liab. Litig., 231 F.R.D. 221, 237 (S.D.W. Va. 2005). The court is free to consider, among other factors, the estimated size of the class, the geographic diversity of the class, the difficulty of identifying class members, and the negative impact on judicial

7

economy if individual suits were required. <u>Christman v. Am. Cyanamid Co.</u>, 92 F.R.D. 441, 451 (N.D.W. Va. 1981).

First, it is unclear exactly what the estimated size of the class is. Plaintiff's estimations amount to mere speculation unaccompanied by evidentiary support. Plaintiff alleges that "[n]umerosity is established here by the nearly 500 students Mountain State previously acknowledged were enrolled in the online DMS program." Doc. No. 42 at 20. This number is derived from a July 2010 MSU enrollment summary chart which indicates that 493 online students were majoring in DMS. Doc. No. 42-13 at 11. However, from additional testimonial and documentary evidence it is clear that this number is merely students who chose DMS as a major – not those who were actually accepted into the online DMS program. Indeed, only an estimated fifteen to twenty percent of students that declared DMS as a major were accepted to the program. Doc. No. 52 at 82. From July 2007 to December 2012 - the entire history of the online DMS program - only 209 students were actually admitted to the program. <u>Id.</u> at 76-77; Doc. No. 41-1 at 29. The "pre-DMS" students who simply declared DMS as their major were taking prerequisite courses, and they were not required to complete clinical externships. Doc. No. 52 at 129-30. As such, they cannot be included in a proposed class where the primary grievance is the failure to provide a clinical externship site.

The evidence supports a much more modest estimated size of the proposed class. Of the 209 students admitted to the program throughout its history, 110 graduated with a bachelor and/or associate degree in DMS. See Doc. No. 41-1 at 29-46. Two other students completed their clinical rotations, but failed to complete all of the prerequisites. Thirty online DMS students were dismissed from the program for various reasons including failing courses, failing to submit clinical paperwork, felony conviction, and excessive absences at clinical facilities. Id. An additional thirty-nine students withdrew from the online DMS program for a variety of reasons including financial reasons, military service, leaves of absence, or otherwise abandoning studies by failing to register or return after a period of probation. Id. Of these thirty-nine students, sixteen withdrew for reasons not reflected in MSU's records. As such, what the actual number of this proposed class would be is unclear. Yet, one thing is certain – it would be significantly less than the hundreds that plaintiff estimates.

Plaintiff's mere speculation does not meet her burden, and she has provided no meaningful evidence that refutes the evidentiary support for a much more modest estimation of the size of the proposed class. Conclusory and speculative allegations as to the size of the class are insufficient to establish numerosity. See Abby v. Paige, 282 F.R.D. 576,578 (S.D. Fla.

9

2012) ("Here, numerosity is, at best speculative. Instead of directing the Court to record evidence, Plaintiff Abby asserts in the motion that the 'numerosity element has easily been met as a reasonable and common sense estimate . . . .'").

Second, plaintiff concedes that locating class members will not be difficult because defendant possesses the contact information for each member. Doc. No. 33 at 16; Doc. No. 42 at 18 ("Indeed, it would be absurd for Mountain State to assert that it does not have name and address information for its students, because Mountain State has produced a list in this litigation that includes the student's city and state."). This seems like a logical conclusion which is supported by the information in defendant's exhibits. From the record, it appears that the class members can be easily located. Yet, plaintiff seems to think this fact supports her contention that joinder is impracticable. On the contrary, it buttresses the conclusion that joinder is not impracticable. See Ansari v. New York Univ., 179 F.R.D. 112, 115 (S.D.N.Y. 1998) ("Although knowledge of the whereabouts of proposed class members does not automatically make joinder practicable, it should provide comfort to [plaintiff] who, if he so chooses, can contact each of his former classmates, apprise each of his lawsuit, and invite each to join."). Having access to this contact information, as plaintiff assures the court defendant does, means that each individual can be contacted to

determine their interests in the litigation, their desire or lack thereof to join a class action, or their wish to bring an individual action.  Such "[k]knowledge of names and existence of members has been called the most important factor, precisely because it renders joinder practicable." Primavera Familienstiftung v. Askin, 178 F.R.D. 405, 410 (S.D.N.Y. 1998) (internal quotations omitted) (denying class certification); see also Kennedy v. Virginia Polytechnic Inst. & State Univ., 7-08-CV-00579, 2010 WL 3743642 at *4 (W.D. Va. Sept. 23, 2010) ("Joinder is not impractical because the named plaintiffs . . . have access to the names, current addresses, and salary histories of all potential plaintiffs whose rights may be affected by the pending litigation.").  And while it appears that the proposed class is geographically dispersed, the access to this contact information mitigates the problems raised by geographic dispersion.  See Ansari, 179 F.R.D. at 115.

Another critical consideration affecting the practicability of joinder is the ability and willingness of individual class members to bring individual actions.  Perhaps most important to this inquiry is the size of the individual claims, because "small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 617 (1997).  A direct corollary to this notion is that joinder is more likely

11

practicable when individual recoveries are substantial.  Indeed, it is the very policy of class actions to avoid the problem that arises when small claims do not provide the incentive to any individual to bring an action on his own behalf.  "A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."  Mace v. Van Ru Credit Corp., 109 F.3d 338, 344 (7th Cir. 1997).

Here, the damages alleged are anything but insubstantial.  As alleged by plaintiff in her complaint, tuition for the DMS bachelor degree program costs $68,310 excluding any prerequisites, and the associate degree DMS program costs $51,480 exclusive of prerequisites.  Doc. No. 12 at ¶¶ 24-25.  Plaintiff alleges she incurred approximately $60,000 in student loan debt to pursue a DMS degree.  Id. at ¶ 19.  Plaintiff also alleges consequential and incidental damages.  Potential recoveries of this nature provide a strong incentive to putative class members to pursue individual actions or join plaintiff's action.  As then Judge Mukasey of the Southern District of New York stated in a case that also involved a putative class action against an educational institution,

> Assuming that each member of the proposed class has a claim similar to [plaintiff's] – as he himself urges – then each could expect to recover the amount of the tuition, $30,000, plus the opportunity cost of having attended the program,

12

>   which [plaintiff] estimates about $60,000 for
>   himself. A potential award of around $90,000 is
>   hardly the type of de minimis recovery that would
>   discourage individual class members from joining
>   [plaintiff's] suit or from filing suits on their
>   own behalf.

Ansari, 179 F.R.D. at 116; see also Deen v. New School Univ., 2008 WL 331366 at *4 (S.D.N.Y. 2008) (finding joinder to be practicable where the potential damages award could be up to $60,000 per individual despite the fact that the proposed class consisted of approximately 110 students).

On this record, plaintiff has failed to establish numerosity. This court is required to perform a "rigorous analysis" into the Rule 23(a) requirements, and plaintiff is not entitled to the benefit of the doubt when little to no evidence supports a finding that joinder is impracticable. The likelihood of a very modest size of this class, in conjunction with the other factors discussed above which strongly suggest that joinder is not impracticable illustrate that plaintiff has not met her burden of establishing numerosity. Having not satisfied the court that joinder is impracticable, plaintiff is not entitled to certification of the proposed class.

### b. Remaining Rule 23 Requirements

Having failed to establish numerosity, the court declines to address the remaining Rule 23(a) elements of commonality, typicality, and adequacy of representation. The court also

13

declines to address the Rule 23(b)(3) requirements in depth. Nonetheless, the court notes that plaintiff's evidentiary submissions are likely insufficient to meet her burden established by the Supreme Court. See Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) (requiring "evidentiary proof" of at least one Rule 23(b) provision). Additionally, the discussion above concerning the significant amount of the potential individual damages awards as it applies to the practicability of joinder applies equally to the predominance and superiority requirements of Rule 23(b)(3). See Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 617 (1997). That is, when potential individual damages awards are substantial as they are here, a class action is more likely not superior to other available methods for fairly and efficiently adjudicating the controversy.

### III. Conclusion

Plaintiff's failure to establish that the proposed class is so numerous that joinder is impracticable is sufficient to dispose of plaintiff's motion. As such, the court DENIES plaintiff's motion for class certification (Doc. No. 32).

The Clerk is directed to send copies of this Memorandum Opinion and Order to counsel of record.

IT IS SO ORDERED this 27th day of March, 2014.

ENTER:

David A. Faber
Senior United States District Judge